**United States District Court**
For the Northern District of California

1

2

3

4                            UNITED STATES DISTRICT COURT

5                           NORTHERN DISTRICT OF CALIFORNIA

6

7

8
    BAXTER HEALTHCARE
9   CORPORATION,

10          Plaintiffs,                          No. C 07-1359 PJH

11          v.                                   **ORDER CONSTRUING CLAIMS**

12  FRESENIUS MEDICAL CARE
    HOLDINGS, INC., dba FRESENIUS
13  MEDICAL CARE NORTH AMERICA,
    et al.,
14
            Defendants.
15  _____/

16          Plaintiffs Baxter Healthcare Corporation, Baxter International, Inc., and Baxter

17  Healthcare SA (collectively, "Baxter"), and DEKA Products Limited Partnership ("DEKA")

18  assert nine patents against defendants Fresenius Medical Care Holdings, Inc. d/b/a

19  Fresenius Medical Care North America, and Fresenius USA, Inc. (collectively, "Fresenius").

20          The patents at issue in this action involve or relate to systems and methods for

21  performing peritoneal dialysis ("PD"), to assist patients suffering from end-stage renal

22  disease.  Such patients' kidneys do not function properly in that they fail to remove harmful

23  waste products from the blood.  PD is an alternative to hemodialysis, which pulls blood out

24  of the body, filters the waste in a machine, and returns the cleansed blood to the body.

25          By contrast, PD does not directly filter the waste directly out of the blood.  Rather, a

26  sterile solution known as "peritoneal dialysis solution" or "dialysate" is infused into the

27  patient's peritoneal, or abdominal, cavity by way of a catheter surgically implanted into the

28  abdomen.  The dialysate remains in the peritoneal cavity for a prescribed amount of time,

1   during which time diffusion and osmosis exchanges take place between the solution and

2   the bloodstream across the natural body membranes.  These exchanges remove the waste

3   products that kidneys normally excrete.  The dialysate (including the filtered waste) is then

4   drained from the peritoneal cavity.

5          PD was initially performed by hand, using a syringe, or by using the force of gravity

6   to help the dialysate fill into and drain from the patient's peritoneal cavity.  Machines were

7   eventually developed to assist patients with this process.  These "Automated Peritoneal

8   Dialysis" or "APD" machines are sometimes referred to as "cyclers" because they cycle

9   dialysate through the dialysis treatment.  APD cyclers are particularly attractive to some PD

10  patients because the machines can work while the patients sleep at home.

11         Baxter is a leading provider of dialysis-related products and services, including PD

12  systems, disposables, and related equipment.  One of the first cyclers for personal home

13  use was Baxter's PAC-XTRA™, which was introduced in the 1980s.  The PAC-XTRA™

14  was a large and complicated device, which used gravity to help fill the patient's peritoneal

15  cavity and drain the dialysate.  In 1994, Baxter introduced the HomeChoice™.  Instead of

16  gravity, the HomeChoice™ uses air pressure and diaphragm pump technology to move

17  dialysate in and out of the patient's peritoneal cavity.  DEKA is an engineering design

18  company that owns a number of the patents used in the HomeChoice™ machine.

19         The HomeChoice™ dialysis machine resulted from a collaboration between Baxter

20  and inventor Dean Kamen (one of the principals of DEKA), after Baxter sought DEKA's

21  help in improving the PAC-XTRA™.  Baxter wanted a machine that was smaller, easier for

22  patients to use, and more fool-proof.  Plaintiffs claim that the HomeChoice™ machine is

23  now considered the standard for PD.

24         The nine patents at issue in the present action are U.S. Patent No. 5,324,422 ("the

25  '422 patent"); U.S. Patent No. 5,421,823 ("the '823 patent"); U.S. Patent No. 5,431,626

26  ("the '626 patent"); U.S. Patent No. 5,438,510 ("the '510 patent"); U.S. Patent No.

27  6,503,062 ("the '062 patent"); U.S. Patent No. 6,808,369 ("the '369 patent"); U.S. Patent

28  No. 6,814,547 ("the '547 patent"); U.S. Patent No. 6,929,751 ("the '751 patent"); and U.S.

1   Patent No. 7,083,719 ("the '719 patent").

2       The '422, '823, '626, and '510 patents comprise the '823 patent family, also referred

3   to the "1993 patents" or the "HomeChoice patents."  The '369 and '062 patents comprise

4   the '062 patent family, also referred to as the "2000 patents" or the "system calibration

5   patents."  The '719, '751, and '547 patents are referred to as "2002 patents."  Of this last

6   group, only the '547 patent is at issue in the present claims construction, as the parties

7   have agreed to stay the action, both as to claims and counterclaims, relating to the '751

8   patent and the '719 patent.

9       The parties now seek an order construing nine disputed terms.[1]  The first six terms

10  appear variously in the four patents that comprise the '823 patent family (the '422, '823,

11  '626, and '510 patents).  The next two terms appear in the two patents comprising the '062

12  patent family (the '062 and '369 patents).  The last term appears in patents across all three

13  patent groups.

**DISCUSSION**

14

15  A.   Legal Standard

16      Patent infringement analysis involves a two-step process.  First, the court must

17  determine as a matter of law the correct scope and meaning of disputed claim terms.

18  Second, the properly construed claims are compared to the accused device to see whether

19  the device contains all the limitations (literally or by equivalents) in the claims at issue.

20  Markman v. Westview Instruments, Inc., 517 U.S. 370, 384 (1996).

21      "[T]he claims of a patent define the invention to which the patentee is entitled the

22  right to exclude."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and

23  quotation omitted); see also Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243,

24  1248 (Fed. Cir. 1998) (claim construction "begins and ends" with the actual words of the

25  claims).  The terms used in the claims bear a "heavy presumption" that they mean what

26

27      [1]  The parties originally sought construction of a tenth term – "calibrating" ('062 patent,
28  claims 10, 10, 16, 21) – but subsequently advised the court that they had reached agreement
    as to the construction of this term.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art.  CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).

A patentee is presumed to have intended the ordinary meaning of a claim term in the absence of an express intent to the contrary.  See York Prods., Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996).  The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  Phillips, 415 F.3d at 1313.  The person of ordinary skill in the art is "deemed to read the claim term not only in the context of  the particular claim . . . but in the context of the entire patent, including the specification."  Id.  The words in the claim may also be interpreted in light of the prosecution history, if in evidence.  Teleflex, Inc. v. Ficosa North Am. Corp., 299 F. 3d 1313, 1324-25 (Fed. Cir. 2002).

"[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  Vitronics Corp. v. Conceptronic, Inc., 90 F. 3d 1576, 1582 (Fed. Cir. 1996).  Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language may the court then rely on extrinsic evidence, such as expert declarations.  Id. at 1583 (in cases where public record unambiguously describes scope of patented invention, "reliance on any extrinsic evidence is improper").

B.     The Disputed Terms and the Claims Construction

1.     **applying fluid pressure to the diaphragm to operate the pump chamber** ('823 patent, claims 1, 10, 16, 21, and 25)

This term appears only in the '823 patent, and is asserted in independent claims 1, 10, 16, 21, and 25, all of which are "method" claims.  The parties dispute whether "to operate" is adequately explained by the words of the claims; or, conversely, whether "to operate" necessitates (a) the application of alternating positive and negative fluid pressure, (b) in pulses, (c) such that the diaphragm is flexed in and out.

Plaintiffs propose that this term means "applying pressure through a gas or liquid to

United States District Court

For the Northern District of California

1   the diaphragm to operate the pump chamber."  Fresenius proposes that this term means

2   "applying alternating positive and negative fluid pressure pulses to the diaphragm such that

3   the diaphragm is flexed in and out and liquid moves through the pump chamber."

4          Thus, both sides agree that "applying" means "applying;" that "fluid pressure" means

5   either "fluid pressure" or "pressure through a gas or liquid;"[2] that "to the diaphragm" means

6   "to the diaphragm;" and that "pump chamber" means "pump chamber."  What is left is the

7   construction of the two words – "to operate."  Plaintiffs contend that "to operate" should be

8   construed as having its ordinary and customary meaning.  Fresenius asserts, however,

9   that under O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., 521 F.3d 1351 (Fed.

10  Cir. 2008), the court is required to construe "to operate" because the parties have raised an

11  actual dispute regarding the proper scope of the term.  See id. at 1361.

12         The claim language provides the starting point for analysis of the words "to operate."

13  Claim 1 discloses that the pump chamber "operates" by the application of "fluid pressure to

14  the diaphragm."  The claim language also makes clear that "operation" of the pump

15  chamber "either move[s] dialysis solution fluid from the peritoneal cavity" – "or move[s]

16  dialysis solution into the peritoneal cavity."  Thus, the meaning of "to operate" is explained

17  by the claim language itself.

18         Nothing in the specification suggests that the patentees intended a meaning of "to

19  operate" other than the plain and ordinary meaning of those words as used in the claims.

20  The specification identifies preferred embodiments in which both positive and negative

21  pressures are applied.  See, e.g., '823 patent, 8:60-68, 13:22-29; 20:48-58; 21:40-50.

22         In addition, the "Summary of the Invention" explicitly identifies the embodiment in

23  which both positive and negative pressures are applied as a preferred embodiment.  See

24  id., 2:52, 3:16-20).  Because that configuration is described as "preferred" only (not

25  required), and does not avow a broader claim scope, this claim term cannot be limited to

26  require both positive and negative pressure.  Where there is no narrowing limitation in the

27  _____

28         [2]  Plaintiffs note that Fresenius appears to accept plaintiffs' construction of "fluid" as "a
    gas or a liquid."

1   claim language and no express disavowal of broader language in the written description, it

2   is error to rely on a preferred embodiment to limit the claim term.  Gemstar-TV Guide Int'l,

3   Inc. v. Int'l Trade Comm'n, 383 F.3d 1352, 1368-69 (Fed. Cir. 2004)

4        Neither the claims themselves nor the specification support Fresenius' narrow

5   construction, and Fresenius has pointed to no language in either the claims or specification

6   clearly limiting the claims to embodiments disclosed in the '823 specification.  The '823

7   patent claim language itself is not limited to pneumatics, is not limited to alternating positive

8   and negative fluid pressure pulses, and is not limited to flexing the diaphragm in and out.

9        Absent any indication that the patentees intended to define the phrase "to operate"

10  to require both positive and negative fluid pressure pulses, the court will not read into the

11  claim language limitations taken from the preferred embodiments.  See Liebel-Flarsheim

12  Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004).  In addition, the doctrine of claim

13  differentiation precludes Fresenius' proposed addition of the words "alternating positive and

14  negative fluid pressure."

15        Under the doctrine of claim differentiation, when one claim does not recite a

16  particular limitation that is recited in another claim, "that limitation cannot be read into the

17  former claim."  Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1326 (Fed.

18  Cir. 2003).  Each claim is presumed to be different in scope, and that presumption "is

19  especially strong where there is a dispute over whether a limitation found in a dependent

20  claim should be read into an independent claim, and that limitation is the only meaningful

21  difference between two claims."  Ecolab, Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1375 (Fed.

22  Cir. 2002); see also Liebel-Flarsheim, 358 F.3d at 909.

23        Here, independent claims 1, 10, 16, 21, and 25 of the '823 patent all recite "applying

24  fluid pressure" generally, and do not specify any particular type of fluid pressure.  However,

25  claims that depend from those independent claims narrowly recite the specific types of fluid

26  pressure.  Dependent claims 5, 14, and 19 specify a "fluid pressure that is below

27  atmospheric pressure" – that is, negative pressure.  Dependent claims 6, 15, and 20

28  specify a "fluid pressure that is above atmospheric pressure" – that is, positive pressure.

United States District Court
For the Northern District of California

6

United States District Court

For the Northern District of California

1  Thus, under Fresenius' proposed construction, the limitation of negative pressure in
2  dependent claims 5, 14, and 19, and the limitation of positive pressure in dependent claims
3  6, 15, and 20, would be redundant and superfluous.

4     It is true that the doctrine of claim differentiation is a rebuttable presumption, which
5  may be overcome "by a contrary construction dictated by the written description or the
6  prosecution history."  Seachange, Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1368-69 (Fed.
7  Cir. 2005).  Here, however, Fresenius has pointed to no evidence from the intrinsic record
8  to overcome this presumption.

9     With regard to the second and third limitations proposed by Fresenius – "pulses" and
10 "such that the diaphragm is flexed in and out" – "fluid pressure" is used generically in
11 independent claims 1, 10, 16, 21, and 25.  Nothing in the patent dictates that the "fluid
12 pressure" be applied in "pulses" or that it "flex" the diaphragm "in and out."

13    In short, nothing in the specification of the '823 patent indicates that the patentees
14 intended to give some special meaning to the words "to operate."  The claim language
15 preceding and following "to operate" – "applying fluid pressure to the diaphragm" and "to
16 either move dialysis solution fluid from the peritoneal cavity or move dialysis fluid into the
17 peritoneal cavity – clearly explains how the "operation" occurs and what it accomplishes.

18    **"Applying fluid pressure to the diaphragm to operate the pump**
19    **chamber"** means "**applying pressure through a gas or liquid to the**
20    **diaphragm to operate the pump chamber.**"

21

22    2.    **actuator means for operating the pumping mechanism to (i) drain**
23          **spent dialysis liquid from the peritoneal cavity through, and (ii)**
24          **infuse fresh dialysis liquid from a source into the peritoneal cavity**
25          ('422 patent, claim 1)
26          **actuator means for operating the pumping mechanism to emulate**
27          **gravity flow conditions independent of head height conditions** ('510
28          patent, claim 1)

7

United States District Court
For the Northern District of California

1    This term appears in claim 1 of the '422 patent and in claim 1 of the '510 patent,

2  both of which are part of the '823 patent family.  The parties agree that these claims recite

3  means-plus-function limitations under 35 U.S.C. § 112 ¶ 6.

4    In construing a means-plus-function term, the court must first determine the claimed

5  function, and must then "identify the corresponding structure in the written description" for

6  performing the recited function.  AllVoice Computing PLC v. Nuance Commc'ns, Inc., 504

7  F.3d 1236, 1240 (Fed. Cir. 2007).  That structure, along with its equivalents, are within the

8  literal scope of the claim.  35 U.S.C. § 112 ¶ 6.  When construing a means-plus-function

9  term, "a court may not import functional limitations that are not recited in the claim, or

10  structural limitations from the written description that are unnecessary to perform the

11  claimed function."  Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1233

12  (Fed. Cir. 2001).

13    Here, the parties agree that the applicable functions are recited in the claim terms

14  themselves, after the words "means for."  That is, the function of "actuator means" in the

15  '422 patent is "operating the pumping mechanism to (1) drain spent peritoneal dialysis

16  liquid from the peritoneal cavity through, and (2) infuse fresh dialysis liquid from a source

17  into the peritoneal cavity;" and the function of "actuator means in the '510 patent is

18  "operating the pumping mechanism to emulate gravity flow conditions independent of head

19  height conditions."

20    The parties disagree, however, as to which structure or structures described in the

21  specifications of the '422 and '510 patents perform the stated functions.  Plaintiffs propose

22  that the corresponding structure is the "piston element, port and pump actuator

23  components of the piston head assembly, and equivalents thereof."  Fresenius proposes

24  that the corresponding structure is the "first and second pressure actuating networks (230

25  and 232), the pump actuators (PA1 and PA2), the valve actuators (VA1-VA10), and the

26  associated valves (A0, A3, A4, B0, B1, B4, C0-C4, D1-D5)."

27    The specification links a structure (the pump actuators) to the claimed function

28  ("operating the pump mechanism").  See '510 patent, Fig. 8A.  Both sides agree that the

8

United States District Court
For the Northern District of California

1   pump actuators PA1 and PA2 are corresponding structure to perform the necessary

2   function of the actuator means.  Accordingly, the court finds that the pump actuators are

3   part of the structure.

4       In addition, the structure that the specification identifies as operating the pumping

5   mechanism to move dialysate to and from the patient, and to emulate gravity flow

6   conditions independent of head height, is pump chambers P1 and P2, the corresponding

7   pump actuator cavities PA1 and PA2, and the ports 120 that supply fluid pressure to those

8   PA1 and PA2 cavities.  '510 patent, 2:61-64, 13:5-9, 14:1-14; '422 patent, 12:16-20, 13:12-

9   26.  These structures are illustrated in Figs. 8A and 13.

10      The patents describe Fig. 8A as "a plan view of the one side of the cassette shown

11  in Fig. 8, showing the liquid paths within the cassette."  Fig. 13 is "a perspective view of the

12  operative front side of the fluid pressure piston housed within the cassette module."  Fig. 8A

13  shows the pump chambers P1 and P2.  A "piston element," 102 in Fig. 13, sits behind the

14  cassette and operates the pumps.  '510 patent, 12:64-13:4 ("piston element 102 comprises

15  a molded or machined plastic or metal body" containing "two pump actuators PA1 and

16  PA2" and ten valve actuators); '422 patent, 12:7-15 (same).

17      Because the piston element 102 is a solid piece of material, fluid pressure must

18  necessarily flow through ports 120 to operate the pumps and perform the claimed function.

19  See '510 patent, 13:5-9 ("Each actuator PA1/PA2 . . .  includes a port 120); 14:1-14

20  (". . . This, in turn, moves liquid through the cassette."); see also id. 20:17-23 ("These

21  actuators [pump actuator PA1 and associated valve actuators], in turn, operate cassette

22  pump station P1 and valve stations V1, V2, V8, and V10, respectively, which serve pump

23  station P1."); 20:24-30 (same for PA2 and P2), Fig. 8A; and Fig. 13; and '422 patent, 12:7-

24  15, 13:12-26, 19:38-51 (same as for '510 patent); Fig. 8A; Fig. 13.

25      The court finds that the piston element (which actually forms the pump actuators

26  PA1 and PA2) and the ports inside the pump actuators (through which pressure fills and

27  exits the pump actuators) are also, therefore, necessary corresponding structure.

28      Fresenius seeks to add additional structure beyond those actually necessary to

9

United States District Court

For the Northern District of California

1    operate the pumping mechanism – including entire pressure networks and twenty-six

2    valves.  However, the specification expressly distinguishes between "pump actuators,"

3    which operate the pump, and the other structure Fresenius proposes to add, such as the

4    "first and second pressure actuating networks" and "valve actuators and associated

5    valves," which serve or work with the pump actuators and pump.  See '510 patent, 20:17-

6    23 ("The first pressure actuating network 230 distributes negative and positive pressures to

7    the first pump actuator PA1 and the valve actuators that serve it (namely, VA1; VA2; VA8;

8    VA9; and VA10).  These actuators, in turn, operate cassette pump station P1 and valve

9    stations V1; V2; V8; V9; and V10, respectively, which serve pump station P1"); '422 patent,

10   19:38-44 (same).

11        "The corresponding structure to a function set forth in a means-plus-function

12   limitation must actually perform the recited function, not merely enable the pertinent

13   structure to operate as intended."  Asyst Techs., Inc. v. Empak, Inc., 268 F.3d 1364, 1371

14   (Fed. Cir. 2001).  Here, while the additional structure identified by Fresenius – the valves

15   (which work with the pump chambers), the valve actuators (which are also formed by the

16   piston element and correspond to the valve stations much as the pump actuators

17   correspond to the pump stations), and the pressure actuating networks (which distribute

18   the fluid pressure from the air pump to the pump and valve actuators using tubing) – all

19   enable the pumping mechanism to operate, they do not actually perform the claimed

20   function of operating the pumping mechanism.

21        Indeed, the specification states that the valves and valve actuators merely "serve"

22   the pump actuators, and that the pressure actuating network merely "distributes" pressure

23   to the pump actuators.  See '510 patent, 20:17-23 ("The first pressure actuating network

24   230 distributes negative and positive pressures to the first pump actuator PA1 and the

25   valve actuators that serve it (namely, VA1; VA2; VA8; VA9; and VA10).  These actuators, in

26   turn, operate cassette pump station P1 and valve stations V1; V2; V8; V9; and V10,

27   respectively, which serve pump station P1."); '422 patent, 19:38-44 (same); see also '510

28   patent, 20:49-55 ("first actuating network 230 provides" pressure valve actuators and first

10

United States District Court

For the Northern District of California

1  pumping actuator).  Accordingly, the valves, valve actuators, and pressure actuating

2  network are not corresponding structure to the claimed "actuator means."

3       The court adopts the parties' agreed function for the term "**actuator means**" in the

4  '422 patent as

5       "**operating the pump mechanism to (i) drain spent peritoneal dialysis**

6       **liquid from the peritoneal cavity through, and (ii) infuse fresh dialysis**

7       **liquid from a source into the peritoneal cavity.**"

8  The court also adopts the parties' agreed function for the term "**actuator means**" in the

9  '510 patent as

10      "**operating the pumping mechanism to emulate gravity flow conditions**

11      **independent of head height conditions.**"

12  The corresponding structure for the "**actuator means**" of both the '422 and the '510

13  patents is

14      "**piston element, port and pump actuator components of the piston head**

15      **assembly, and equivalents thereof.**"

16

17      3.      **pressure conveying element** ('626 patent, claims 34, 38, 41, 44)

18      This term appears in asserted independent claims 34, 38, 41, and 44 of the '626

19  patent.  The parties' dispute centers on whether this term requires construction, and, if so,

20  whether the patent requires specific pressure-conveying components.

21      Plaintiffs propose that "pressure conveying element" means "a pressure conveying

22  element."  Fresenius proposes that "pressure conveying element" means "an assembly

23  including at least (1) a pressure transfer element (e.g., 102) in contact against the

24  diaphragm of the pump chamber to apply positive and negative fluid pressure to the

25  diaphragm; (2) pneumatic control valves; (3) inflatable reservoir/main bladder (e.g., 128;

26  (4) a conduit for transporting positive pneumatic pressure from the source to the inflatable

27  reservoir (e.g., 216); (5) a pressure regulator communicating with the inflatable reservoir;

28  and (6) a carrier (e.g., 104) that moves the pressure transfer element."

United States District Court

For the Northern District of California

1    The court finds that the claims and specification support the plain and ordinary

2    meaning.  In some cases, "the ordinary meaning of claim language as understood by a

3    person of skill in the art may be readily apparent even to lay judges, and . . . involves little

4    more than the application of the widely accepted meaning of commonly understood words."

5    Phillips, 415 F.3d at 1314.  Here, the widely accepted and commonly understood meaning

6    of "pressure conveying element" makes sense in conjunction with the rest of the asserted

7    claims in the '626 patent.

8    For example, claim 34 recites "a pressure conveying element carried within the

9    housing for conveying fluid pressure to the diaphragm to operate the pump chamber and

10   valve . . . ."  '626 patent, 42:66-43:2.  In other words, the claim itself explains that the

11   "pressure conveying element" is for "conveying fluid pressure to the diaphragm to operate

12   the pump chamber and valve."  Similarly, claims 38, 41, and 42 all recite "a pressure

13   conveying element carried within the housing for conveying fluid pressure . . . to operate

14   the pump chamber and valve . . . . " '626 patent, 43:59-64, 44:23-31, 44:56-61.  The claim

15   language therefore suggests that the court should not further limit this term.

16   Nothing in the specification indicates that any further limit should be placed on this

17   term.  The patent describes several different types of pressure-conveying elements.  See

18   '626 patent, 13:50-57 ("As Fig. 15B shows, when the main bladder 128 inflates, it presses

19   the plate 104 against the spring element 132.  The open cell structure of the spring element

20   132 resiliently deforms under the pressure.  The piston element 102 moves within the

21   window 134 into pressure contact against the cassette diaphragm 59.") and Fig. 15B; '626

22   patent, 13:6-8 ("The ports 120 convey positive or negative pneumatic pressures from the

23   pneumatic pressure distribution module 88 (as will be described in greater detail later)"); id.,

24   19:66-68 ("Valve A6 is either opened to convey air in the main branch line 216 to the low

25   pressure reservoir 214 or closed to block this conveyance.")

26   However, because the '626 patent does not suggest that the "pressure conveying

27   element" is limited to any particular embodiment, specific "pressure conveying" components

28   cannot be read into the claim.  Fresenius' proposed construction would improperly exclude

United States District Court

For the Northern District of California

1  the above-described embodiment, because the embodiment lacks the six specific features

2  Fresenius has included in its proposed construction.

3      The doctrine of claim differentiation also precludes Fresenius' attempt to read the

4  additional specific components into the general and straightforward term "pressure

5  conveying element."  Dependent claims 2 and 3, which depend from independent claim 1

6  (not asserted here), recite the same structural limitations on "pressure conveying element"

7  that Fresenius proposes to read into claim 1 (except for the second item – "pneumatic

8  control valves").

9      Under the doctrine of claim differentiation, the "pressure conveying element" in claim

10  1 must have a broader and different scope than the specific configuration claimed in claims

11  2 and 3.  The additional limitations claimed in claims 2 and 3 would be redundant if

12  "pressure conveying element" itself necessarily included these structures.  <u>See</u> <u>SunRace</u>

13  <u>Roots Enter. Co., Ltd. v. SRAM Corp.</u>, 336 F.3d 1298, 1303 (Fed. Cir. 2003).  Fresenius

14  points to no language in either the claims, the specification, or the prosecution history that

15  expressly requires that the additional limitations to "pressure conveying element" in

16  dependent claims 2 and 3 be imported into the construction of "pressure conveying

17  element" generally.  <u>See</u> <u>id.</u>

18      "**Pressure conveying element**" means "**pressure conveying element.**"

19

20      4.      **drain[s] spent peritoneal dialysis liquid from the peritoneal cavity**

21              **<u>through</u>** ('422 patent, claim 1)

22      This term appears in asserted independent claim 1 of the '422 patent (and, without

23  the "through," in claim 1 of the '510 patent).  Claim 1 of the '422 patent recites, in relevant

24  part,

25              actuator means for operating the pumping mechanism to:

26              (i) drain spent peritoneal dialysis liquid from the peritoneal cavity
                <u>through</u>, and

27              (ii) infuse fresh dialysis liquid from a source into the peritoneal

28              cavity,

13

United States District Court

For the Northern District of California

1   '422 patent, 38:25-30 (emphasis added).

2          The parties agree that claim 1 of the '422 patent contains a typographical error.

3   They dispute whether the error is the addition of the preposition "through," or the failure to

4   append a noun phrase that serves as a complement to the preposition "through" (that is,

5   the failure to add an object to the preposition); and, if the latter, whether the claim term is

6   indefinite because there is no possible way that is obvious on the face of the patent to

7   correct the error.

8          Plaintiffs assert that the typographical error is the addition of "through" to this claim

9   language.  They advocate simply removing the word "through," and propose that the term

10  means "drain spent peritoneal dialysis liquid from the peritoneal cavity."

11         Fresenius argues that the typographical error is the failure to append an object to the

12  preposition "through," and asserts that this term cannot be construed because it is

13  incomplete.  According to Fresenius, a person of skill in the art would not know "through"

14  what structure the peritoneal dialysis liquid is drained – whether it is a pumping mechanism,

15  a conduit, or something else.  Fresenius claims that the limitation therefore does not satisfy

16  the statutory requirements of § 112 of the Patent Act.

17         Fresenius asserts in addition that regardless of whether "through" was intentionally

18  or inadvertently included, a reader cannot determine whether it was intentional (thus

19  necessitating an object after the "through") or inadvertent (thus necessitating the removal of

20  the "through").  Thus, Fresenius argues, since the reader cannot know what correction is

21  necessary or how the claim should be interpreted, the claim is not amenable to the

22  correction.

23         The court may correct obvious minor typographical and clerical errors in patent

24  claims when the correction is not subject to reasonable debate based on consideration of

25  the claim language and the specification; and the prosecution history does not suggest a

26  different interpretation of the claims.  Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d

27  1348, 1357 (Fed. Cir. 2003); see also Hoffer v. Microsoft Corp., 405 F. 3d 1326, 1331 (Fed.

28  Cir. 2005) ("When a harmless error in a patent is not subject to reasonable debate, it can

United States District Court
For the Northern District of California

1  be corrected by the court.").

2      The definiteness of a claim term depends on whether that term can be given "any

3  reasonable meaning." Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347

4  (Fed. Cir. 2005).  Moreover, a difficult issue of claim construction does not automatically

5  result in a holding of indefiniteness. Id.  "Only claims not amenable to construction or

6  insolubly ambiguous are indefinite." Id. (quotation and citations omitted).

7      The court finds that Fresenius has failed to carry its burden of showing by clear and

8  convincing evidence that the disputed term in claim 1 is "not amenable to construction" or is

9  "insolubly ambiguous," and has also failed to show that the correction is subject to

10  reasonable debate.

11      Fresenius cites to the deposition of Daniel Ryan, the attorney who prosecuted the

12  '422 patent, claiming that when Ryan was asked "through what" spent dialysate was

13  drained, he responded that the intent of the claim was that spent dialysate be drained

14  through something – "Through a pumping mechanism, through a conduit, through

15  something, didn't just go through the air."

16      However, Fresenius has taken the Ryan comments out of context.  Immediately

17  before the excerpt quoted by Fresenius, Ryan stated that he assumed the word "through"

18  was a typographical error that was correctable.  He also stated that he could not say what

19  the "through" meant unless he could see what the claims said when they were presented to

20  the PTO.

21      Fresenius also asserts, citing Novo, that the court cannot consider any other patent

22  when looking to see whether the correction is subject to reasonable debate, but must look

23  only at the patent in which the disputed term appears.  It is true that the Federal Circuit in

24  Novo looked only at the language of the patent in which the disputed term appeared.

25  However, there was only one patent at issue in Novo.  See id., 350 F.3d at 1349.  Novo

26  provides no authority for a finding that it would be improper to compare the identical claim

27  in two patents filed on the same date, with almost identical specifications.

28      During the claim construction hearing, Fresenius cited a recent Federal Circuit

15

**United States District Court**
For the Northern District of California

1  decision, <u>Fargo Elecs., Inc. v. Iris Ltd., Inc.</u>, 287 Fed. Appx. 96, 2008 WL 2570822 (Fed.

2  Cir., June 27, 2008), to support its contention that there is no proper way to correct the

3  error in claim 1 of the '422 patent.  However, the facts in the <u>Fargo</u> decision are

4  distinguishable.  In <u>Fargo</u>, the plaintiffs did not propose a single way to correct the error, but

5  rather proposed multiple possible ways.  All the possible corrections were supported by the

6  claim language and the specification.  Because the plaintiffs themselves could not

7  determine what the patentee had intended, the matter was subject to reasonable debate.

8        Here, by contrast, Baxter proposes that the obvious error be corrected by eliminating

9  the extraneous word "through," a construction that is supported both by the claim language

10  and the prosecution history.  A person of ordinary skill in the art would understand that this

11  limitation recites two parallel phrases describing fluid movement, one relating to draining

12  dialysate and the other relating to infusing dialysate.  Thus, a person of ordinary skill in the

13  art would readily recognize that the addition of the word "through" in the first of the two

14  parallel phrases is extraneous – a typographical error.  This conclusion is reinforced by the

15  fact that the '510 patent, the specification for which is nearly identical to the specification for

16  the '422 patent, recites the same two parallel fluid movement phrases without the "through"

17  error.  <u>See</u> '510 patent, 38:52-55.  Moreover, Fresenius points to nothing in the prosecution

18  history indicating that the patentee intended the word "through" to be followed by an object.

19        **"Drain spent peritoneal dialysis liquid from the peritoneal cavity**

20        **through"** means "**drain spent peritoneal dialysis liquid from the**

21        **peritoneal cavity**."

22

23        5.     **means responsive to first alarm signal** ('510 patent, claim 6)

24        This term appears in asserted claim 6 of the '510 patent.  Claim 6 depends from

25  independent claim 1.  The invention claimed in the '510 patent relates to systems and

26  methods for performing PD.  One aspect of the invention provides an automated PD

27  system that discriminates between alarm conditions that require user intervention to

28  correct, and alarm conditions that reflect conditions that are anomalies but typically correct

16

United States District Court

For the Northern District of California

1  themselves with minimum or no user intervention.  '510 patent, 2:55-60.

2     Claim 1 recites "an automated peritoneal dialysis system" that includes "means for

3  establishing flow communication with the patient's peritoneal cavity catheter through a

4  pumping mechanism;" "actuator means for operating the pumping mechanism;" "control

5  means for directing operation of the actuator means;" and "means for monitoring system

6  operation."

7     The "means for monitoring system operation" in turn includes "means for generating

8  a first alarm signal" when system operation fails to satisfy a "predetermined set of criteria;"

9  "means for generating a second alarm signal" when system operation fails to satisfy a

10  "second predetermined set of criteria;" "means for suspending system operation in

11  response to the first alarm signal" and for "requiring user intervention to resume system

12  operation;" and, finally, "means for continuing system operation" in response to the second

13  alarm signal, "canceling the second alarm condition without user intervention" if system

14  operation satisfies a second set of criteria, and initiating a first alarm condition if system

15  operation fails to satisfy the second set of criteria.

16     Dependent claim 6 recites

17     [a] system according to claim 1 wherein the means responsive to first alarm
       signal includes an interface having input means through which the user
18     intervenes.

19  The parties agree that the term "means responsive to first alarm signal" is a means-plus-

20  function limitation under 35 U.S.C. § 112 ¶ 6, and that the applicable function is recited in

21  the claim itself, after the word "means" – "respon[ding] to first alarm signal."

22     The dispute involves which structure, identified in the specification, performs the

23  stated function.  Plaintiffs propose that the identified structure is the "key(s) and display

24  screen, and equivalents thereof."  Fresenius proposes that the identified structure is the

25  "controller with special purpose software that, in response to the first alarm signal, sounds

26  an audible alarm and displays an ALARM MENU."

27     The language of claim 6 requires that the structure for "means responsive to first

28  alarm signal" include "an interface through which the user intervenes."  The specification

United States District Court
For the Northern District of California

1  explains that, in the event of a first alarm signal, the controller gives the user information

2  about the error, and the options for responding:

> The controller 16 raises ALARM 1 in situations that require user intervention
> to correct. . . . The controller 16 also displays an ALARM MENU that informs
> the user about the condition that should be corrected.  The ALARM MENU
> gives the user the choice to correct the condition and CONTINUE; to END the
> therapy; or to BYPASS (i.e., ignore) the condition and resume the therapy
> session.

Id., 31:53-64.  The specification further explains that, using the information gleaned from

the display screen, the user can then utilize the keypad and, in particular, the key(s), to

issue commands:

> The controller 16 includes a user interface 367 with a display screen 370 and
> keypad 368.  The user interface 367 receives characters from the keypad
> 368, displays text to a display screen 370, and sounds the speaker 372
> (shown in Figs. 9 and 10).  The interface 367 presents status information to
> the user during a therapy session.  The interface 367 also allows the user to
> enter and edit therapy parameters, and to issue therapy commands.

Id., 26:26-34; see also Figs. 2, 9, 10.

In other words, the "interface having input means" through which – or by means of

which – the user responds to the first alarm signal is the key(s) and display screen.  This is

the only structure necessary for performing the claimed function.  See Wenger Mfg., 239

F.3d at 1233.

Fresenius contends that because claim 6 recites "a system according to claim 1

wherein the means responsive to first alarm signal . . ." (emphasis added), the claim is

indefinite, or, if the claim is not indefinite, it is not clear what the corresponding structure is.

Fresenius asserts that a claim may be indefinite if a term lacks proper antecedent basis,

where such basis is not otherwise present by implication or the meaning is not readily

ascertainable.

Fresenius contends that in this case, claim 1 includes no "means responsive to first

alarm signal," and the basis is not present by implication and is not readily ascertainable

from the claim.  Fresenius argues that neither claim 6 nor claim 1 identifies in any way "the

means responsive to first alarm signal," and asserts that as a result, claim 6 is indefinite.

"The requirement of antecedent basis is a rule of patent drafting, administered

18

**United States District Court**
For the Northern District of California

during patent examination." Energizer Holdings, Inc. v. Int'l Trade Comm'n, 435 F.3d 1366, 1370 (Fed. Cir. 2006). In Patent Law Fundamentals, the editors explain the concept of "antecedent basis" as follows:

> An ambiguity would exist if an element were preceded by the definite article [e.g., the filament] when first mentioned in the claim. The question which would naturally enter one's mind would be: "What filament?" Accordingly, a foundation or antecedent basis must be laid for each element recited. This can be done, usually in the preamble, by introducing each element with the indefinite article ("a" or "an"). Subsequent mention of the element is to be modified by the definite article or by "said" or "the said," thereby making later mention(s) of the element unequivocally referable to its earlier recitation.

Mills, Reiley, and Highley, Patent Law Fundamentals (2008) § 14.13.

Claim indefiniteness is not analyzed "in a vacuum," but rather "in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art." Energizer Holdings, 435 F.3d at 1370 (quotation and citation omitted). To show a claim indefinite, the accused infringer must "show by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." Halliburton Energy Servs., Inc. v. M-1 LLC, 514 F.3d 1244, 1244 (Fed. Cir. 2008).

The mere fact that there may not be an explicit antecedent basis for the term does not render it indefinite. See Energizer Holdings, 435 F.3d at 1370 (citing Manual of Patent Examining Procedure § 2173.05(e) (8th ed. Rev. 2, May 2004)). Even lacking an explicit antecedent basis, a claim will not be indefinite "[i]f the scope of the claim would be reasonably ascertainable by those skilled in the art." Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1359 (Fed. Cir. 2001), quoted in Energizer Holdings, 435 F.3d at 1370-71. Moreover, an antecedent basis can be present by implication. Slimfold Manufacturing Co. v. Kinkead Indus., Inc., 810 F.2d 1113, 1116 (Fed. Cir. 1987).

In Energizer Holdings, the Federal Circuit overturned a ruling by the International Trade Commission that Energizer's claim for "zero-mercury-added" alkaline batteries was indefinite because the claim lacked antecedent basis for the term "said zinc anode." The

United States District Court

For the Northern District of California

1    court held that the lack of antecedent basis did not render the claim so indefinite that it

2    could not be reasonably understood and that it was reasonably ascertainable that "said zinc

3    anode" referred to the "anode gel" recited earlier in the claim.  Id. at 1370-71.

4          In the present case, the term that Fresenius asserts lacks an antecedent basis is a

5    means-plus-function limitation in dependent claim 6 ("the means responsive to first alarm

6    signal"), which clearly refers back to the language in independent claim 1 ("means for (i)

7    suspending system operation in response to the first alarm signal; and (ii) requiring user

8    intervention to resume system operation").  So even though there may not be an explicit

9    antecedent basis for "the means responsive to first alarm signal" recited in the patent, the

10   court finds that independent claim 1 provides sufficient antecedent basis for the term, either

11   directly or by implication.  See id. at 1370 (finding antecedent basis by implication).

12         The specification provides additional context.  See '510 patent, 3:8-11 ("the

13   monitoring mechanism [that] works to: (i) suspend system operation in response to the first

14   alarm signal, requiring user intervention to resume system operation").  Accordingly, the

15   court finds that Fresenius has not established that this term is indefinite for lack of

16   antecedent basis.

17         Fresenius argues in the alternative that if the claim is not indefinite, the only

18   disclosed structure "responsive to first alarm signal" is the cycler's controller and its special

19   purpose software.  Fresenius cites the specification, "When ALARM1 [first alarm signal]

20   occurs, the controller 16 suspends the therapy session and sounds an audible alarm.  The

21   controller 16 also displays an ALARM MENU that informs the user about the condition that

22   should be corrected."  Id., 31:56-60.  Fresenius contends that if the claim is to be

23   construed, that is the corresponding structure.

24         Fresenius claims that keys and a display screen cannot be the corresponding

25   structure because they can do nothing without a controller and software.  Fresenius also

26   notes that the specification specifically states that "[t]he controller 16 includes a user

27   interface 367 with a display screen 370 and keypad 368."  Id., 26:26-28.

28         As noted above, however, the specification clearly explains that the user responds to

the first alarm signal by using the keys/keypad and display screen "interface."  Fresenius' proposed construction is both too broad and too narrow.  It is too broad because it includes structure that is not necessary to performing the claimed function – the audible alarm and the alarm menu.  It is too narrow because it excludes the key(s) and the display screen, which are necessary for the patient to respond to an alarm signal.

The court adopts the parties' agreed function for the term "**means responsive to the first alarm signal**" in the '510 patent as

"**responding to first alarm signal**."

The corresponding structure for the "**means responsive to first alarm signal**" is

"**key(s) and display screen, and equivalents thereof**."

6.     **means for (i) continuing system operation for a predetermined time period in response to the second alarm signal; (ii) canceling the second alarm condition without user intervention when, after the predetermined time period, system operation satisfies the second set of criteria; and (iii) initiating a first alarm condition when, after the predetermined time period, system operation fails to satisfy the second set of criteria** ('510 patent, claim 1)

One aspect of the invention claimed in the '510 patent "provides an automated peritoneal dialysis system that discriminates between alarm conditions that require user intervention to correct and alarm conditions that reflect conditions that are anomalies but typically correct themselves with minimum or no user intervention."  '510 patent, 2:55-60.

The disputed term appears in asserted claim 1 of the '510 patent.  The parties agree that this is a means-plus-function limitation under 35 U.S.C. § 112 ¶ 6, and that the applicable function is recited in the claim itself, after the words "means for" –

(i) continuing system operation for a predetermined time period in response to the second alarm signal; (ii) canceling the second alarm condition without user intervention when, after the predetermined time period, system operation satisfies the second set of criteria; and (iii) initiating a first alarm condition when, after the predetermined time period, system operation fails to satisfy

1    the second set of criteria.

2    The parties dispute which structure, identified in the specification, performs the stated

3    function; and whether the lack of antecedent basis for "the second alarm condition" (in

4    subpart ii) renders the claim indefinite.

5         Plaintiffs propose that the corresponding structure is a controller with software that is

6    tailored to perform the various steps set forth in the agreed-upon function.  Specifically,

7    plaintiffs propose that the structure is

8         a controller with software for (i) continuing system operation for a
     predetermined time period in response to the second alarm signal; (ii)
9    canceling the second alarm condition without user intervention when, after the
     predetermined time period, system operation satisfies the second  set of
10   criteria; and (iii) initiating a first alarm condition when, after the predetermined
     time period, system operation fails to satisfy the second set of criteria, and
11   equivalents thereof.

12        Fresenius, on the other hand, asserts that the limitation is indefinite because the

13   phrase "the second alarm condition" of subpart (ii) of the limitation lacks antecedent basis.

14   In the alternative, to the extent that the court finds the limitation not indefinite, Fresenius

15   proposes that the corresponding structure is as follows:

16        As to function (i) controller 16 and special purpose software performing the
     following algorithm: in response to ALARM2 continue system operation for 30
17   seconds and if the alarm condition persists after 30 seconds continue system
     operation for an additional 30 seconds.  As to function (ii) controller 16 and
18   special purpose software performing the following algorithm: if during the first
     or second 30 second periods of continued operation the condition that
19   generated the ALARM2 no longer exist, cancel the ALARM2.  As to function
     (iii) controller 16 and special purpose software performing the following
20   algorithm: if ALARM2 condition persists at the end of a second 30-second
     period, raise an ALARM1.

21        As an initial matter, the court finds that the claim is not indefinite for lack of
22
     antecedent basis.  As with the prior term ("means responsive to first alarm signal," No. 5,
23
     above), the court finds that "the second alarm condition" can easily be understood by
24
     reference to the language in the remainder of claim 1 of the '510 patent.
25
          Taken in context, the phrase "the second alarm condition" clearly refers to the status
26
     or condition of having been alerted by the second alarm signal.  The  specification provides
27
     additional context.  See '510 patent, 32:5-13 ("When ALARM2 occurs, the controller 16
28

United States District Court

For the Northern District of California

1    generates a first audible signal . . . .  The controller 16 then mutes the audible signal for 30

2    seconds . . . . If the condition still exists after 30 second [sic], the controller 16 generates a

3    second audible signal . . . .").

4         Turning to the question of what structure corresponds to the claimed function, the

5    court notes that each side's proposed structure includes a "controller" and "software," and

6    that the specification identifies a controller with software for performing the claimed function

7    as the corresponding structure for this term.  The mechanism for monitoring system

8    operation

9         includes a monitoring element for generating a first alarm signal when system
         operation fails to satisfy a first predetermined set of criteria.  It also includes
10        another monitoring element for generating a second alarm signal when
         system operation fails to satisfy a second predetermined set of criteria
11        different than the first set of criteria.

12   Id., 3:1-7.  The specification identifies the cycler controller 16 as the structure that carries

13   out such monitoring functions.  Id., 26:25-26 ("The controller 16 carries out process control

14   and monitoring functions for the cycler 14.").

15        Figs. 9, 10, 17, and 18 show the controller 16.  Id., 26:24.  As illustrated, "the

16   controller 16 comprises a central microprocessing unit (CPU) 358 [which] employs

17   conventional real-time multi-tasking to allocate CPU cycles to application tasks" and

18   "includes a user interface 367 with a display screen 370 and keypad 368."  Id., 26:26-42.

19        "In a means-plus-function claim in which the disclosed structure is a computer, or

20   microprocessor, programmed to carry out an algorithm, the disclosed structure is not the

21   general purpose computer, but rather the special purpose computer programmed to

22   perform the disclosed algorithm."  WMS Gaming, Inc. v. International Game Technology,

23   184 F.3d 1339, 1349 (Fed. Cir. 1999); quoted in Aristocrat Techs. Australia Pty Ltd. v.

24   International Game Tech., 521 F.3d 1328, 1333 (Fed. Cir.), cert. denied, 129 S.Ct. 754

25   (2008).  "Thus the patent must disclose . . . enough of an algorithm to provide the

26   necessary structure under § 112, ¶ 6."  Finisar Corp. v. DirecTV Group, Inc., 523 F.3d

27   1323, 1340 (Fed. Cir), cert. denied, 129 S.Ct. 754 (2008).

28        An algorithm is a set of well-defined rules for the solution of a problem in a finite

United States District Court

For the Northern District of California

1    number of steps.  IEEE 100, The Authoritative Dictionary of IEEE Standard Terms (7th ed.

2    2000), at 25.  In software, an algorithm is "any sequence of operations for performing a

3    specific task."  Id.  Courts permit a patentee to express an algorithm "in any understandable

4    terms including as a mathematical formula, in prose, or as a flow chart, or in any other

5    manner that provides sufficient structure."  Finisar, 523 F.3d at 1340.  Where software is

6    involved, the "algorithms in the specification need only disclose adequate drafting structure

7    to render the bounds of the claim understandable to one of ordinary skill in the art."

8    AllVoice, 504 F.3d at 1245.

9        Here, the controller uses an algorithm set forth in the specification and via an

10   exemplary embodiment in Fig. 30.  The specification explains that the monitoring

11   mechanism works to

12       (1) suspend system operation in response to the first alarm signal, requiring
         user intervention to resume system operation, (ii) continue system operation
13       for a predetermined time period in response to the second alarm signal, then
         canceling the second alarm condition without user intervention when, after the
14       predetermined time period, system operation satisfies the second set of
         criteria; and (iii) initiate a first alarm condition when, after the predetermined
15       period, system operation fails to satisfy the second set of criteria.

16   Id., 3:8-20, and Fig. 30.

17       Fig. 30 is labeled "Alarm Routines," and is described in the specification as "a flow

18   chart showing the operation of the alarm routines that the controller for the cycler shown in

19   Fig. 1 employs."  '510 patent, 5:57-59; see also id., 31:51-52 (Fig. 30 shows the ALARM1

20   and ALARM2 routines).  "The controller 16 raises ALARM1 in situations that require user

21   intervention to correct . . . " and "raises ALARM2 in situations which are anomalies but will

22   typically correct themselves with little or no user intervention . . . ."  Id., 31:53-32:4.  If the

23   situation that triggers ALARM2 is not corrected within a predetermined amount of time,

24   following two distinct audible signals, the controller will raise an ALARM1, and "[t]he user is

25   then required to intervene using the ALARM MENU."  Id., 32:5-13.

26       The algorithm disclosed in the '510 patent for performing the three functions recited

27   in the disputed term in (i) through (iii) is the description of the monitoring mechanism in the

28   "Summary of the Patent," and the "alarm routines" described in Fig. 30.  Fresenius'

24

United States District Court

For the Northern District of California

proposed construction impermissibly seeks to limit the claim term by adding limitations to its proposed structure which are beyond the requirements of the claim term – "ALARM1," "ALARM2," and defined time periods of 30 seconds.  None of these structures is necessary to perform the claimed function, as it requires only a "first alarm condition," a "second alarm condition," and a "predetermined time period," respectively.

The court adopts the parties' agreed function for the disputed term in claim 1 of the '510 patent as

**(i) continuing system operation for a predetermined time period in response to the second alarm signal; (ii) canceling the second alarm condition without user intervention when, after the predetermined time period, system operation satisfies the second set of criteria; and (iii) initiating a first alarm condition when, after the predetermined time period, system operation fails to satisfy the second set of criteria.**

The corresponding structure for this term is

**a controller with software as illustrated in Fig. 30 that suspends system operation in response to the first alarm signal, requiring user intervention to resume system operation; that continues system operation for a predetermined time period in response to the second alarm signal, then cancels the second alarm condition without user intervention when, after the predetermined time period, system operation satisfies the second set of criteria; and that initiates a first alarm condition when, after the predetermined period, system operation fails to satisfy the second set of criteria; and equivalents thereof.**

7.      **control volume** ('062 patent, claims 1, 16)

This term appears in independent claims 1 and 16 of the '062 patent.  The '062 patent "relates to fluid flow control devices and, more specifically, to regulating pump pressures.  In particular, the invention provides a method and apparatus for increasing the

United States District Court

For the Northern District of California

fluid flow rate in a fluid flow control device while maintaining desired pressure levels." '062 patent, 1:6-10.

Claim 1 recites

A method for regulating pressure at a distal end of a fluid line, the method comprising:

> providing a fluid control system, the fluid control system having at least one liquid volume in valved communication with the distal end, a control volume in pressure communication with the liquid volume, means for measuring pressure in the control volume, and means for adjusting the pressure in the control volume;

> calibrating the means for measuring the pressure;

> establishing communication between the liquid volume and the distal end;

> measuring a pressure of the control volume; and

> adjusting the pressure in the control volume in accordance with the measured pressure.

Claim 16 recites

A method for regulating pressure at the distal end of a fluid line, the method comprising:

> providing a fluid flow control system, the fluid flow control system having at least one liquid volume in valved communication with the distal end, a control volume in pressure communication with the liquid volume, a pressure traducer in communication with the control volume, and a pressure adjuster in communication with the control volume;

> calibrating the pressure traducer;

> establishing communication between the liquid volume and the distal end;

> measuring a pressure of the control volume; and

> adjusting the pressure in the control volume in accordance with the measured pressure.

The parties dispute whether "control volume" simply refers to a "volume" of gas or liquid that "regulates" or "guides" the flow control system; or whether "control volume" more specifically refers to that portion of the "pump chamber" that contains the pressurizing fluid, and which is separated (in that pump chamber) from the "liquid volume" by the

"membrane."

Plaintiffs propose that "control volume" means "a volume of gas or liquid used in regulating and guiding the fluid flow control system." Plaintiffs also accept Fresenius' expert's definition of "control volume," which is "a region in space which is mathematically defined with the purpose of analyzing the region." Fresenius proposes that "control volume" means "the portion of the pump chamber that contains the pressurizing fluid and is separated from the liquid volume by the membrane."

The claims and specification of the '062 patent do not explicitly define "control volume" to have a special meaning, but instead use "control volume" to refer broadly to a volume of fluid (gas or liquid, as the parties agree) used in regulating and guiding operation of the claimed device.

For example, Claim 1 recites "[a] method for regulating pressure at a distal end of a fluid line, the method comprising . . . ," and includes the step of "measuring a pressure of the control volume," and then, to control the liquid flow control device, requires "adjusting the pressure in the control volume in accordance with the measured pressure." Id., 7:1-3.

In certain preferred embodiments, pressure measurements are taken at the control volume and used in calculations that form the basis for system adjustments – that is, to regulate and guide the fluid flow control system. The specification states that a "control volume" can be used to identify pressure correlations and calculate pressure values, which values the processor then uses to control the fluid flow control device:

> The fluid flow control device preferably includes a control volume for each liquid volume, a transducer for each control volume, and a processor for reading and storing pressure values, computing and identifying a correlation between pressure values, and calculating pressure values based on identified correlations. The processor may estimate the elevation differential based upon the pressure values, and/or regulate fluid pump pressures.

Id., 2:8-15; see also id., 5:51-56 ("In process 514, the pressure transducer 315 measures the pressure in the second control volume 311, and the relative elevation is estimated in process 515 based on the pressure in the second control volume and the calibration constants generated during calibration"). In other words, the "pressure in the second

27

'control volume'" is used to estimate the relative elevation between the fluid control device and the distal end of the fluid line.

Fresenius' proposed construction ignores distinctions made by the claims and specifications.  Fresenius argues that the claimed "control volume" must be "a portion of the pump chamber."  However, this proposal is directly contradicted by the patent, as the specification clearly indicates that the control volume need not be a portion of the pump chamber.  See id., 6:38-43 ("separate pumps, control volumes, and liquid volumes may be provided and . . . the liquid volumes and control volumes may be located at a different point from the pumps along the fluid pathway to the distal end of the fluid line"); id., 2:23-24 (in one preferred embodiment, "the liquid volume and the control volume themselves are parts of a pump").

Similarly, Fresenius defines "control volume" as containing "the pressurizing fluid" (e.g., only a gas or a liquid).  However, the specification states that while pressurizing "may occur" through the use of a gas or a liquid, it may also occur through "other methods known in the art, such as pumps, pistons, pressurized reservoirs, valves, and vents."  Id., 3:35-38.  A construction that excludes embodiments of the invention described in the specification "is rarely, if ever, correct and would require highly persuasive evidentiary support."  Vitronics, 90 F.3d at 1583.  Fresenius offers no such highly persuasive support here.

Fresenius' proposal that the control volume must be "separated from the liquid volume by the membrane" is also contradicted by the patent.  For example, claim 2, which depends from claim 1, requires that "the liquid volume includes a flexible membrane that separates the liquid volume from the control volume."  Under the doctrine of claim differentiation, the requirement that the control volume is separated from the liquid volume by a flexible membrane cannot be read into claim 1, because it is a limitation that is recited in claim 2.  See, e.g., Phillips, 415 F.3d at 1314-15 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim"); Liebel-Flarsheim, 358 F.3d at 910 ("where the limitation that is sought to be 'read into' an independent claim already appears in a

28

United States District Court

For the Northern District of California

1   dependent claim, the doctrine of claim differentiation is at its strongest").

2       **"Control volume"** means **"a volume of gas or liquid used in regulating and**

3   **guiding the fluid flow control system."**

4

5       8.      **calibrating** ('062 patent, claims 1, 10, 16, 21)

6       This term appears in the '062 patent.  The parties have agreed that "calibrating"

7   should be construed in accordance with the definition the patentees provided to the PTO

8   during the prosecution of the patent.  Thus, no dispute remains as to the construction of

9   this term.

10      **"Calibrating"** means "**to standardize (as a measuring instrument) by**

11      **determining deviation from a standard so as to ascertain the proper**

12      **correction factors.**"

13

14      9.      **adjusting the pressure in the control volume in accordance with the**

15              **measured pressure** ('062 patent, claims 1, 16)

16              **adjusting the pressure in accordance with the measured pressure**

17              ('062 patent, claims 10, 21)

18              **adjusts the fluid pump pressure in accordance with the relative**

19              **elevation to obtain a desired pressure at the distal end** ('369 patent,

20              claim 1)

21              **adjusting the fluid pump pressure in accordance with the relative**

22              **elevation to obtain a desired pressure at the distal end** ('369 patent,

23              claim 7)

24      In this disputed term, the phrase "adjusting the pressure" is part of four phrases

25   appearing in two different patents, as noted above.  The parties dispute whether these four

26   phrases are sufficiently related to be construed as one term, or whether they should be

27   construed separately.  They also dispute whether "adjusting" should be construed as

28   having its ordinary meaning, or whether the "adjusting" can be done only at a particular

29

United States District Court

For the Northern District of California

1    step, as part of an ordered sequence of steps.

2         Plaintiffs argue that the four phrases actually comprise four terms in four distinct

3    claims.  Plaintiffs assert that the court should decline to construe these terms, asserting

4    that they are not sufficiently closely related for joint construction as a single term, that they

5    contain many potential claims for construction, and that Fresenius appears to be attempting

6    to get around the court's ten-term limit.

7         In addition, however, plaintiffs contend that these terms do not require construction

8    because they are plain and unambiguous.  Thus, plaintiffs propose that the two terms from

9    the '062 patent be construed as "adjusting the pressure in the control volume in accordance

10   with the measured pressure" and "adjusting the pressure in accordance with the measured

11   pressure;" and that the two terms from the '369 patent be construed as "adjusts/adjusting

12   the fluid pump pressure in accordance with the relative elevation to obtain a desired

13   pressure at the distal end."

14        Fresenius, on the other hand, proposes that the two terms from the '062 patent be

15   construed as "adjusting the pressure in the control volume based on (1) the system

16   correction factors obtained during calibration and (2) the measured pressure in the control

17   volume after the liquid is placed in fluid communication with the distal end of the fluid line;"

18   and that the two terms from the '362 patent be construed as "adjusting the pressure in the

19   control volume based on the estimate provided by the controller of the height differential

20   between the pump and the distal end of the fluid line [to obtain a desired pressure at the

21   distal end]."

22        Both sides proffer proposed constructions that include the words "adjusting the

23   pressure" to explain the meaning of "adjusting the pressure," and "adjusting the pressure in

24   the control volume" to explain the meaning of "adjusting the pressure in the control

25   volume."  Thus, it cannot be that they seek a judicial construction of "adjusting the

26   pressure" or "adjusting the pressure in the control volume."

27        While plaintiffs argue that the words in the claims themselves are sufficient ("in

28   accordance with the measured pressure" in the '062 patent, and "in accordance with the

relative elevation to obtain a desired pressure at the distal end" in the '369 patent), it appears that Fresenius seeks construction of the words that follow "adjusting the pressure" in claims 1 and 16 of the '062 patent; the words that follow "adjust[ing] the fluid pump pressure" in claims 1 and 7 of the '369 patent;[3] and the words that follow "adjusting the pressure in the control volume" in claims 10 and 21 of the '062 patent.

In other words, Fresenius proposes a construction of the phrases "in accordance with the measured pressure" ('062 patent) and "in accordance with the relative elevation" ('369 patent). Specifically, Fresenius asserts that "in accordance with the measured pressure" means "based on (1) the system correction factors obtained during calibration and (2) the measured pressure in the control volume after the liquid is placed in fluid communication with the distal end of the fluid line," and that "in accordance with the relative elevation" means "based on the estimate provided by the controller of the height differential between the pump and the distal end of the fluid line."

The court finds that the claims and specifications of the two patents do not suggest a construction other than the plain and ordinary meaning of the words "in accordance with the measured pressure" and "in accordance with the relative elevation." The specification does not support Fresenius' additions to the claim terms, but rather mirrors the claim language itself. Thus, there is no need for the court to construe these terms.

Both the '062 patent and the '369 patent "relate to fluid flow control devices, and, more specifically, to regulating pump pressure." '062 patent, 1:6-7; '369 patent, 1:10-11. In claims 1, 10, 16, and 21 of the '062 patent, a "method for regulating pressure" in a fluid line or at the distal end of a fluid line comprises "a fluid flow control system" with "means for measuring pressure." Each of these claims also includes the step of "measuring pressure," and the step of "adjusting the pressure in accordance with the measured pressure."

In claims 1 and 7 of the '369 patent, a "system for regulating fluid pump pressures" comprises  "a fluid flow control device" that includes "pressure means for pressurizing . . .

_____

[3] Fresenius proposes construing "adjust[ing] the fluid pump pressure" as "adjusting the pressure in the control volume."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  at least one liquid volume;" "a transducer . . . for measuring pressure;" and "a controller"

2  used "for controlling the fluid pump pressure," for estimating "a relative elevation between

3  the fluid control device and the distal end" based on information received from the

4  transducer; and for "adjusting the fluid pump pressure in accordance with the relative

5  elevation to obtain a desired pressure at the distal end."

6      In both the '062 patent and the '369 patent, the "Summary of the Invention" states

7  that the inventions provide a method for "regulating fluid pump pressures based on the

8  relative elevation between a fluid flow control device and a distal end of a fluid line by

9  providing at least one liquid volume in valved communication with the distal end."  '062

10  patent, 1:56-60; '369 patent, 1:60-64.  After "[t]he pressure measurement of the liquid

11  volume is calibrated, . . . valving is opened to establish communication between the liquid

12  volume and the distal end of the fluid line."  '062 patent, 1:60-63; '369 patent, 1:64-67.  "A

13  pressure associated with the one liquid volume is measured, and the fluid pump pressure is

14  adjusted in accordance with the measured pressure."  '062 patent, 1:63-65; see also id,

15  2:5-7 (same); '369 patent, 1:67-2:2 (same); id., 2:9-11 (same).

16      The "Detailed Description of Specific Embodiments" describes "[a] computer

17  program product" which "may be employed for implementing the methods" of the invention.

18  This computer program product may include "program code for calculating a desired fluid

19  pump pressure" as well as "program code for adjusting the pump pressure in accordance

20  with the desired pump pressure."  '062 patent, 6:5-20; '369 patent, 6:9-24 (same); see also

21  '062 patent, 6:21-28 ("The computer program product may be run on a data processing

22  unit, which acts as a controller.  Such a unit may be capable of adjusting the flow rate of

23  fluid being pumped to the distal end 208 by adjusting the pump pressure.  For example, if

24  the calculation determined that the distal end 208 of the fluid line 204 and the fluid control

25  system were at the same height, the pump pressure might be safely increased above 75

26  mm Hg resulting in faster flow rate."); '369 patent, 6:25-32 (same).

27      Both patents also explain that "the pressure in the pumps 300 and 310 may be

28  adjusted in process 517 to accommodate the height differential."  '062 patent, 6:2-4; '369

United States District Court

For the Northern District of California

1    patent, 6:6-8; <u>see also</u> '062 patent, 4:52-54; '369 patent, 4:46-58 (". . . the pump pressure

2    may be adjusted to accommodate the height differential in process 405").

3           While it is true, as Fresenius asserts, that "adjusting the pressure" in the '062 patent

4    occurs only after the calibration step, and after pressure in the control volume is measured

5    after the liquid volume is placed in fluid communication with the distal end, <u>see id.</u>, 6:55-7:3;

6    <u>id.</u>, 7:9-26; <u>id.</u>, 8:52-67, it does not follow that "adjusting the pressure" should be construed

7    as requiring adjustments based on (1) system correction factors obtained through

8    calibration, and (2) measured pressure in the control volume after establishing fluid

9    communication with the fluid line's distal end.  The pressure is simply adjusted "in

10   accordance with the measured pressure."

11          Fresenius' proposed construction of the terms from the '369 patent also reflects an

12   improper attempt to import limitations from the '369 specification into the claims –

13   specifically, the inclusion of "control volume" in their proposed construction.  While "control

14   volumes" are claimed in the '062 patent, they do not appear in any claim limitation in the

15   '369 patent.

16          In addition, Fresenius has chosen to substitute "relative elevation" in the claim with

17   "estimate provided by the controller of the height differential between the pump and the

18   distal end of the fluid line."  The words used in the patent are sufficiently concise without

19   the additional words that Fresenius has improperly attempted to import from the

20   specification.  <u>See</u>, <u>e.g.</u>, '369 patent, 6:4-8 ("Subsequently, the pressure at the distal end

21   208 of the fluid line 204, P (distal end), due to the elevation differential may be calculated in

22   process 516.  Finally, the pressure in the pumps 300 and 310 may be adjusted in process

23   517 to accommodate the height differential.").

24          "**Adjusting the pressure in the control volume in accordance with the**

25          **measured pressure**" means **"adjusting the pressure in the control**

26          **volume in accordance with the measured pressure."**

27          **"Adjusting the pressure in accordance with the measured pressure"**

28          means **"adjusting the pressure in accordance with the measured**

United States District Court

For the Northern District of California

1    pressure."

2    **"Adjust[ing] the fluid pump pressure in accordance with the relative**

3    **elevation to obtain a desired pressure at the distal end"** means

4    **"adjust[ing] the fluid pump pressure in accordance with the relative**

5    **elevation to obtain a desired pressure at the distal end."**

6

7         10.    **membrane** ('547 patent, claim 12)

8         This term, as asserted, appears in the '547 patent, the '369 patent, and the '626

9    patent.  At the claim construction hearing, Fresenius adopted plaintiffs' proposed

10   construction of "membrane" to mean "barrier" in the '369 and '626 patents.  Thus, the

11   parties' dispute focuses on the construction of "membrane" in asserted independent claim

12   12 of the '547 patent.

13        The parties dispute whether the "membrane" must be "flexible" and "capable of

14   being deformed," or whether it should simply be defined as a "barrier" without those

15   limitations.  Plaintiffs propose that "membrane" means "barrier."  Fresenius proposes that

16   "membrane" as used in the '547 patent means "a flexible sheet capable of being deformed

17   under the disclosed pressures."

18        The '547 patent claims a method, system, and apparatus for performing PD.  To that

19   end, a medical fluid pump for a dialysis system is provided.  See '547 patent, 1:4-8.

20        Claim 12 of the '547 patent recites:

21        A pump connected to at least one vacuum source for use in a system for
          providing dialysis treatment, the pump comprising:
22
              a first chamber wall;
23
              a second chamber wall, the second chamber wall defining an
24            aperture;

25            first and second fluid receiving membranes disposed between
              the first and second chamber walls, the [sic] at least one
26            vacuum source operable to apply a vacuum between the
              membrane and the walls;
27
              a piston, at least a portion of which moves through the aperture,
28            the piston including a piston head having an external shape

                                          34

United States District Court
For the Northern District of California

1    substantially similar to a mating internal shape of the first
2    chamber wall, the piston in operation contacting one of the
     membranes; and

3    a dialysis fluid opening enabling dialysis fluid to be pulled in
4    between the first and second membranes upon movement of
     the piston.

5    Fresenius contends that claim 12 of the '547 patent requires that the two

6    "membranes" form a dialysate receptacle, and that in operation, the membranes be pulled

7    apart from one another by application of the vacuum and movement of the piston, which

8    allows the receptacle to fill with dialysate.  Thus, Fresenius asserts, the "membranes"

9    recited in claim 12 must be flexible, and must permit deformation in response to the

10   pressures applied by the piston and the pneumatic vacuum.

11   The court finds, however, that none of the claims of the '547 patent – including claim

12   12 – suggests that the ordinary and customary meaning of the term "membrane" as a

13   "barrier" should be given a construction other than the agreed-upon construction for the

14   '369 and '626 patents.  In particular, there is no indication in the language of the claims of

15   the '547 patent that the generic word "membrane" should be given any special meaning, or

16   that it should be construed as being "flexible."  In claim 12, both a rigid and a flexible

17   membrane can be "fluid receiving," and both can "contact" the piston.

18   "[T]he person of ordinary skill in the art is deemed to read the claim term not only in

19   the context of the particular claim in which the disputed term appears, but in the context of

20   the entire patent, including the specification."  Phillips, 415 F.3d at 1313.  The '547 patent

21   specification refers both to generic membranes and to specific types of membranes.  The

22   specification uses the term "membrane" to refer not only to the disposable layers between

23   which fluid flows during pump operation, but also to a patient's peritoneam, see '547 patent,

24   1:44-46 ("dialysate contacts the patient's peritoneal membrane in the peritoneal cavity"); to

25   a flexible housing, see id., 6:12-17 (the disposable unit in one embodiment of the invention

26   "includes a first flexible membrane and a second flexible membrane that house the pump

27   receptacle, the fluid heating path and the rigid valve manifold" and a "rigid frame that

28   attaches to at least one of the first and second flexible membranes"); and to hydrophobic

United States District Court
For the Northern District of California

1   tips that form a liquid barrier between the patient line and the atmosphere, see id., 22:32-40

2   (Fig. 12 illustrates cross section of tip protector 280, and a "hydrophobic membrane" is

3   placed on outer edge of tip protector).

4           Fresenius argues, however, that the only "membranes" recited in claim 12 of the

5   '547 patent are the "first and second fluid receiving membranes" that form the fluid

6   receptacle within the pump chamber.  Fresenius contends that the claimed "fluid receiving

7   membranes" are different from the "hydrophobic membranes," which are located

8   completely outside of the pumping chamber and are not claimed in the '547 patent, but are

9   only mentioned in the specification.

10          Fresenius suggests, therefore, that only those portions of the specification that

11  discuss the operation of the fluid-receiving membranes in the disposable unit are the

12  portions that are relevant to the meaning of "membrane" in claim 12.  Fresenius points to

13  the "Summary of the Invention," which describes the invention as a dialysis system with a

14  "disposable unit" that "has at least two flexible membranes that bond together at selected

15  locations and to a rigid plastic piece or manifold . . . The membranes seal to one another so

16  as to define a pump receptacle and a fluid heating pathway."  Id., 3:32-37.

17          Fresenius also notes that the "Summary of the Invention" explains that "[t]he heater

18  heats the fluid heating pathway defined by the flexible membranes of the disposable unit,"

19  id., 5:18-19; and that "[t]he disposable unit in another embodiment includes a first flexible

20  membrane and a second flexible membrane that house the pump receptacle, the fluid

21  heating path and the rigid valve manifold.  The disposable unit also includes a rigid frame

22  that attaches to at least one of the first and second flexible membranes," id., 6:12-17.

23          Based on the above-cited portions of the specification, Fresenius asserts that the

24  specification explicitly distinguishes between the "flexible membranes" and the rigid plastic

25  to which they are attached.  Fresenius contends, moreover, that every embodiment

26  disclosed in the '547 patent specification describes disposable unit 160 as including "a pair

27  of flexible membranes, including an upper flexible membrane 162 and a lower flexible

28  membrane 164," see, e.g., id., 15:38-47, 33:8-11; and that no broader category of

36

United States District Court

For the Northern District of California

1    "membrane" as part of a fluid receptacle is mentioned anywhere in the patent.

2        Fresenius contends in addition that the specification explicitly requires that the

3    "membranes" of the fluid receptacle be capable of deformation by application of vacuum

4    and mechanical pressure.  The patent describes Fig. 13 as "a sectional view of one

5    embodiment of a single layer film structure for the disposable unit membranes of the

6    present invention," and describes Fig. 14 as "a sectional view of one embodiment of a

7    multiple layer film structure for the disposable unit membranes of the present invention."

8    Id., 8:25-30.  The "Detailed Description of the Invention" refers to Figs. 13 and 14 in a

9    section entitled "Membrane Material for the Disposable Unit," explaining that

10            upper and lower membranes 162 and 164 can be fabricated from a
             monolayer film structure 312 (Fig. 13) or a multiple layer film structure (Fig.
11            14).  The film 312 is constructed from a non-PVC containing polymeric
             material and must satisfy numerous physical property requirements.  The film
12            312 must have a low modulus of elasticity so that it can be deformed under
             low pressure to function as a pumping element.  What is meant by low
13            modulus is the film 312 has a modulus of elasticity when measured in
             accordance with ASTM D882, of less than 10,000 psi, more preferably less
14            than about 8,000 psi and even more preferably less than about 5,000 psi and
             finally, less than 3,000 psi, or any range or combination of ranges defined by
15            these numbers.

16    Id., 23:60-24:8.

17        In addition, Fresenius notes, the membrane must be sufficiently flexible so that "it

18    can be deformed under a pressure of 5 psi."  Id., 29:14-15.  "The film maintains its low

19    modulus and deformability properties even after sterilization to continue to meet the

20    pumping requirement."  Id., 29:15-17.  Fresenius contends that this is an express definition,

21    and that it controls the meaning of the term "membrane" as used in the '547 patent.

22        "In some cases, the ordinary meaning of claim language as understood by a person

23    of skill in the art may be readily apparent even to lay judges, and claim construction in such

24    cases involves little more than the application of widely accepted meaning of commonly

25    understood words."  Phillips, 415 F.3d at 1314.  The word "membrane" is a widely

26    understood term that means "barrier."  Where a disputed claim term is accompanied by a

27    clarifying adjective, that clarifying adjective may assist the court in construing the disputed

28    term.  See id.

United States District Court
For the Northern District of California

1    Here, however, Fresenius is attempting to confine the construction to one

2  embodiment in the specification.  The specification for the '547 patent does not require that

3  the "membrane" in claim 12 be flexible.  In every reference cited by Fresenius, the

4  specification clearly indicates that the description applies to one or more embodiments –

5  not that it applies to every possible embodiment of the invention.

6    For example, while it is true, as Fresenius asserts, that the specification states with

7  reference to Figs. 13 and 14 that the "film" from which the membranes may be fabricated

8  "must have a low modulus of elasticity so that it can be deformed under low pressure to

9  function as a pumping element, id., 23:67-24:2, the patentees earlier clarify that they are

10  describing only one of many kinds of membranes that may be used in the invention:

11         Referring now to Figs. 3A, 4A, 4B, 5, and 6, various embodiments of the
           disposable unit 160 are illustrated.  In each of the embodiments, the
12         disposable unit 160 includes a pair of flexible membranes, including an upper
           flexible membrane 162 and a lower flexible membrane 164. . . . The flexible
13         membranes 162 and 164 can be made of any suitable sterile and inert
           material, such as a sterile and inert plastic or rubber. . . . One preferred
14         material for the flexible membrane is described below in connection with Figs.
           13 and 14.
15
   Id., 15:39-56.
16
17    Fresenius has established that at least one embodiment utilizes two (or more)

18  flexible membranes, capable of deformation.  However, the specification also discloses

19  embodiments in which only one of two (or more) membranes is flexible, while the other may

20  not be.  For example, the "Summary of the Invention" describes an embodiment in which

21  only one of the two membranes has these characteristics:

22         Thus, in an embodiment, the system maintains a negative pressure on one of
           the membranes of the fluid receptacle of the disposable unit to pull same
23         away from the other membrane and draw dialysis fluid into the fluid
           receptacle.

24  Id., 4:64-67; see also id., 5:1-7 ("The negative pressure on the active membrane is then

25  released, which pushes the membrane toward the other membrane and dispels the dialysis

26  fluid from the pump receptacle.  In another embodiment, a mechanical pump piston can be

27  pneumatically attached to one of the membranes, wherein the system mechanically pulls

28  the membrane away from the other membrane.")

United States District Court

For the Northern District of California

1    In examining the specification for proper context, the court should avoid importing

2  limitations from the specification into the claims.  See Varco, L.P. v. Pason Sys. USA Corp.,

3  436 F.3d 1368, 1373 (Fed. Cir. 2006).  Even if every disclosed embodiment uses flexible

4  membranes, Phillips squarely rejects limiting the claim on that basis, unless the

5  specification makes clear that "the patentee . . . intends for the claims and the

6  embodiments in the specification to be strictly coextensive."  Phillips, 415 F.3d at 1323,

7  quoted in JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1335 (Fed. Cir.

8  2005).

9    **"Membrane"** means **"barrier."**

10

11                                **CONCLUSION**

12    In accordance with the foregoing, the court finds as follows:

13    1.    **"Applying fluid pressure to the diaphragm to operate the pump**

14  **chamber"** means **"applying pressure through a gas or liquid to the diaphragm to**

15  **operate the pump chamber."**

16    2.    The function for the term **"actuator means"** in the '422 patent is **"operating**

17  **the pump mechanism to (i) drain spent peritoneal dialysis liquid from the peritoneal**

18  **cavity through, and (ii) infuse fresh dialysis liquid from a source into the peritoneal**

19  **cavity**."  The function for the term **"actuator means"** in the '510 patent is **"operating the**

20  **pumping mechanism to emulate gravity flow conditions independent of head height**

21  **conditions."**  The corresponding structure for the **"actuator means"** of both the '422 and

22  the '510 patents is **"piston element, port and pump actuator components of the piston**

23  **head assembly, and equivalents thereof."**

24    3.    **"Pressure conveying element"** means **"pressure conveying element."**

25    4.    **"Drain spent peritoneal dialysis liquid from the peritoneal cavity**

26  **through"** means **"drain spent peritoneal dialysis liquid from the peritoneal cavity."**

27    5.    The function for the term **"means responsive to the first alarm signal"** in

28  the '510 patent is **"responding to first alarm signal."**  The corresponding structure for the

39

**United States District Court**

For the Northern District of California

1   **"means responsive to first alarm signal"** is **"key(s) and display screen, and**

2   **equivalents thereof."**

3       6.      The function for the term **"means for (i) continuing system operation for a**

4   **predetermined time period in response to the second alarm signal; (ii) canceling the**

5   **second alarm condition without user intervention when, after the predetermined time**

6   **period, system operation satisfies the second set of criteria; and (iii) initiating a first**

7   **alarm condition when, after the predetermined time period, system operation fails to**

8   **satisfy the second set of criteria"** in the 510 patent is **(i) continuing system operation**

9   **for a predetermined time period in response to the second alarm signal; (ii)**

10  **canceling the second alarm condition without user intervention when, after the**

11  **predetermined time period, system operation satisfies the second set of criteria; and**

12  **(iii) initiating a first alarm condition when, after the predetermined time period,**

13  **system operation fails to satisfy the second set of criteria."**

14      The corresponding structure for the above-described function is **a controller with**

15  **software as illustrated in Fig. 30 that suspends system operation in response to the**

16  **first alarm signal, requiring user intervention to resume system operation; that**

17  **continues system operation for a predetermined time period in response to the**

18  **second alarm signal, then cancels the second alarm condition without user**

19  **intervention when, after the predetermined time period, system operation satisfies**

20  **the second set of criteria; and that initiates a first alarm condition when, after the**

21  **predetermined period, system operation fails to satisfy the second set of criteria;**

22  **and equivalents thereof.**

23      7.      **"Control volume"** means **"a volume of gas or liquid used in regulating**

24  **and guiding the fluid flow control system."**  Alternatively, to the extent that the parties

25  agree, **"control volume"** means **"a region in space which is mathematically defined**

26  **with the purpose of analyzing the region."**

27      8.      **"Calibrating"** means **"to standardize (as a measuring instrument) by**

28  **determining deviation from a standard so as to ascertain the proper correction**

1  factors."

2     9.    "**Adjusting the pressure in the control volume in accordance with the**

3  **measured pressure**" means "**adjusting the pressure in the control volume in**

4  **accordance with the measured pressure.**"  "**Adjusting the pressure in accordance**

5  **with the measured pressure**" means "**adjusting the pressure in accordance with the**

6  **measured pressure.**"  "**Adjust[ing] the fluid pump pressure in accordance with the**

7  **relative elevation to obtain a desired pressure at the distal end**" means "**adjust[ing]**

8  **the fluid pump pressure in accordance with the relative elevation to obtain a desired**

9  **pressure at the distal end.**"

10     10.    "**Membrane**" means "**barrier.**"

11     The date for the trial of this action, previously set for April 6, 2009, is VACATED, as

12  is the March 12, 2009, date for the pretrial conference.  The parties are directed to meet

13  and confer; and, no later than March 3, 2009, to submit a jointly proposed schedule for

14  future litigation, or a request for a case management conference.

15

16  **IT IS SO ORDERED.**

17  Dated: February 10, 2009

18  _____
    PHYLLIS J. HAMILTON
    United States District Judge

19

20

21

22

23

24

25

26

27

28